**E-FILED**
Tuesday, 01 March, 2011 06:26:57 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| THE FEDERAL DEPOSIT INSURANCE CORPORATION, as RECEIVER OF CORN BELT BANK AND TRUST COMPANY, | ) ) ) ) |
| Plaintiff, | ) |
| v. | ) NO. |
| | ) |
| JEFFREY K. STARK, JAMES L. ADKINS, B. STEVENS PLOWMAN AND LARRY L. SUMMERS, | ) ) JURY DEMANDED |
| Defendants. | ) ) |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC"), as Receiver of Corn Belt

Bank and Trust Company, for its Complaint, states as follows:

## INTRODUCTION

1.      The FDIC brings this action in its capacity as Receiver of Corn Belt Bank and Trust

Company ("Corn Belt" or the "Bank") pursuant to its authority granted by 12 U.S.C. §1821.  The

FDIC seeks to recover losses of at least $10.4 million the Bank suffered because the defendants –

four former Bank directors and/or officers (collectively "Defendants") – failed to adequately inform

themselves of the relevant risks and acted recklessly in approving one or more of five high-risk

commercial loans ("Loss Loans") as members of the Bank's Loan Committee.  The Loss Loans were

improperly underwritten and extended 100 percent financing to out of state, start-up businesses, and

were primarily secured by rapidly depreciating semi-tractors.  Two of the Defendants unilaterally

approved and funded one Loss Loan after the Loan Committee tabled its approval, they failed to

ensure that the Loss Loans were properly administered, and they failed to ensure that the Bank

monitored and protected its security interests in collateral.  The Complaint alleges claims of negligence and gross negligence.

2.      The Defendants' conduct was particularly egregious because they approved making one or more of the Loss Loans after Bank examiners repeatedly warned the Bank that it suffered from weak loan administration, and that it was facing risks posed by out of area lending, high loan-to-value ("LTV") loans, and excessive exposure to loan concentrations within its loan portfolio.  All five of the Loss Loans shared these risk characteristics.

## THE PARTIES

3.      Plaintiff is the Federal Deposit Insurance Corporation, acting as Receiver of Corn Belt, pursuant to 12 U.S.C. §1811 *et seq*.  The FDIC was appointed receiver on February 13, 2009, following the closure of the Bank by the Illinois Department of Financial and Professional Regulation.  FDIC has the right to pursue all of the Bank's claims, including claims against each of the Defendants herein.

4.      Defendant, Jeffrey K. Stark, ("Stark"), was the former President and Chairman of the Board of the Bank at the time the Bank closed.  Stark also served as a Member of the Loan Committee from 1998 until Corn Belt failed.  Stark and his children owned 90.24 percent and 3.40 percent, respectively, of the stock of Corn Belt Bancorp, Inc. (the "Holding Company").  The Bank was a wholly owned subsidiary of the Holding Company.  The Stark Family controlled Corn Belt, since 1973, and Stark himself exerted substantial control over its affairs.

5.      Defendant, James L. Adkins, ("Adkins"), was formerly Senior Vice-President of Lending and a member of the Bank's Loan Committee from April, 2004 until he retired in October, 2008.  He reported directly to Stark and was responsible for enforcing the Bank's loan policies, credit administration, and related operating procedures.

6.      Defendant, B. Stevens Plowman, ("Plowman"), was Director of the Bank having become a director in January, 2003.  In 2004, he became a Member of the Loan Committee. Plowman continued as a Director and Loan Committee Member until the closing of the Bank.

7.      Defendant, Larry L. Summers, ("Summers"), became a Director of the Bank in January, 2003.  In February, 2004, he became a member of the Loan Committee.  Summers continued as a Director and Loan Committee Member until the closing of the Bank.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §§1331 and 1345.

9.      The Court has personal jurisdiction over Defendants pursuant to 735 ILCS §§ 5/2-209(a)(1) and (2).

10.      Venue is proper in this district under 28 U.S.C. Section 1391(b).

## BACKGROUND

11.      Corn Belt was founded in 1946.  It maintained a main office in Pittsfield, Illinois and two (2) branch offices in Jacksonville, Illinois and Clayton, Missouri.
Bank examiners criticized Corn Belt's lending program in 2003 for *inter alia*, not resolving loan administration deficiencies that were compounded in 2005 when Corn Belt embarked on a rapid growth strategy focused on out-of-area commercial lending funded almost exclusively with brokered and internet deposits.

12.      The Reports of Examination ("RoE") for Corn Belt, from 2003 through 2008, reflect that the Bank failed to address recurring criticisms by examiners regarding imprudent lending practices, including the failure to properly underwrite, manage and administer existing credit relationships.

13.     A summary of the recurring criticisms by examiners from 2003 through 2008 is reflected in the following table:

| Examination Year: | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| **Examination Criticism:** | | | | | | |
| Ineffective Oversight | X | | X | X | X | X |
| Weak Loan Administration | X | | X | X | X | X |
| Concentrations of Credit | X | X | X | X | X | X |
| Out of Area Lending | X | X | | | | |
| State Lending Limit Violations | | X | X | | X | X |

14.     By the time Corn Belt failed, loan concentrations equaled 307 percent of its Tier 1 Capital, and 60 percent of its loans scheduled as concentrations were adversely classified.  As of September 30, 2008, Corn Belt reported a loss of $18.1 million primarily from imprudently made commercial loans.

15.     In response to recommendations made by FDIC examiners in the December 2005 RoE, the Bank's Board of Directors approved an action resolution on March 24, 2006 ("Board Resolution").  State and FDIC examiners conducted a joint examination ten (10) months later and found that the unsatisfactory practices and conditions remained.  The failure to address these issues resulted in the issuance of a Memorandum of Understanding ("MOU") between Corn Belt and examiners on April 2, 2007.  The first MOU required Corn Belt to submit a written plan to reduce its risk in substandard assets and concentrations of credit, correct violations of laws, rules, and regulations, provide for an adequate ALLL, and provide quarterly progress reports, among other things.

16.     In the ensuing November 2007 joint RoE, examiners found that the Board had failed to comply with all of the terms contained in the first MOU.  This resulted in the issuance of a second MOU dated March 20, 2008, that reiterated and strengthened prior requirements, and added several new ones.

17.     When the Bank failed to take the required actions, the Illinois Department of Financial and Professional Regulation, and the FDIC issued orders to Cease and Desist ("C&D") on November 24, 2008, and December 31, 2008, respectively, directing Corn Belt to immediately stop soliciting or knowingly accepting uninsured deposits.  A joint examination on September 29, 2008, assigned Corn Belt a CAMELS 5 composite rating.

18.     Corn Belt ultimately failed on February 13, 2009, and the FDIC was appointed as receiver.  Corn Belt had $260.2 million in assets; its failure resulted in an estimated $79.7 million loss to the Deposit Insurance Fund.

19.     This action is against four (4) former officers and/or directors of Corn Belt for at least $10.4 million in damages, comprised of losses from the five Loss Loans that were underwritten in a grossly negligent manner and approved by the Defendants who failed to inform themselves of the risks attendant to the loans.  In addition, Defendants Stark and Adkins were grossly negligent for failing to properly administer the Loss Loans and failing to protect the collateral securing them.

## CORN BELT'S LOAN POLICIES

20.     The Bank's loan policies ("Loan Policy") permitted extensions of credit on a sound and prudent basis.  Loans were required to be underwritten in a manner to minimize the risk of loss to the Bank.

21.     According to the Loan Policy in effect when the Defendants approved the loans to Horizon Leasing, LLC, and Brentwood Truck Leasing, LLC, out-of-area lending was generally to be limited to borrowers that had a business relationship with the Bank or to loans that were in the

Bank's best interest.  Loans to new businesses were undesirable because repayment was dependent upon the new businesses becoming and remaining profitable.

22.     Throughout the relevant time periods, Adkins served on the Loan Committee along with three (3) Directors, Stark, Summers, and Plowman.  Loans could be approved if three (3) of the four (4) Loan Committee members voted to approve them.

## LOSS LOANS

23.     Four of the Loss Loans are comprised of high risk commercial loans made to Horizon Leasing, LLC ("Horizon") for $3.7 million, $300,000 and $1.5 million, and a $5 million loan made to Brentwood Truck Leasing, LLC ("Brentwood").  The fifth Loss Loan was a $1.8 million balloon term loan made to McKenzie Trucking and Leasing, LLC ("McKenzie") for the purpose of acquiring all the debt and assets of Horizon and Brentwood.  The five Loss Loans collectively resulted in over $10.4 million in losses to Corn Belt.

### The Initial Horizon Loans

24.     Based upon good faith information and belief and subject to further discovery, the Defendants approved making two loans to Horizon on or about June 9, 2005.  The first loan was a $3.7 million facility to fund the purchase semi-tractors for Horizon to lease to third parties; the second loan was a $300,000 facility to cover operating expenses.  The Credit Approval Request ("CAR") that supported these loans specifically provided that the loan would be structured as a revolving line of credit ("RLOC").  The CAR specifically warned the Defendants that the loans' weaknesses included the fact that they provided 100 percent financing to start-up business located in Tennessee, out of the Bank's geographical area, and that the loans would be secured by the business assets (semi-tractors), rolling stock, deposit accounts, and guarantees that were limited to only 12 percent of the debt.

25.     In addition to the risks identified in the CAR, the Defendants knew or should have known that other risks attendant to making this loan included, *inter alia*, that the loan terms did not require the borrower to make an equity contribution; that the borrower had inadequate cash flow; that the debt service coverage ratios for the loan were insufficient; that the loan lacked requisite collateral controls; that the credit request improperly relied on prospective operating statements; and that approving the loan created a concentration of credit with existing principals of the borrower.

26.     The Defendants also knew or should have known that structuring the loan as an RLOC was unsafe because it allowed the borrower to make draws in excess of that required to purchase of the semi-tractors. The loan should have been structured as a purchase money facility to acquire a defined number of semi-tractor units for lease to drivers.

27.     Because the RLOC structure allowed the borrower to make draws for note payments and other purposes, the principal balance on the loans never substantially declined, as would have occurred had the Defendants used a loan structure with a defined payout commensurate with the nature of the collateral and its rapid depreciation.

Likewise, securing the loan with rapidly depreciating vehicles resulted in collateral that declined in value by over 50 percent in approximately two years.

28.     Prior to considering whether to approve $4 million in loans to Horizon, the Defendants, as members of the Board of Directors, knew or should have known that the Bank had been previously criticized by examiners for weak loan administration, excessive out-of-area lending with inadequate oversight, for making loans with high LTV ratios, and for having high concentrations of credit within the lending portfolio.

29.     The Defendants approved the $4 million loans to Horizon on

or about June 9, 2005, without taking the necessary steps to inform themselves of the risks attendant to the loans.

30.     Horizon Leasing, LLC defaulted on these loans and the Bank charged-off approximately $3.3 million of these loans on or about October 29, 2008.

### The $1.5 Million Horizon Loan

31.     The Defendants attended a Loan Committee meeting on or about September 30, 2005, and were presented with a loan request to make an additional $1.5 million loan to Horizon for the purchase of semi-tractor trailers for lease to drivers and to increase the original $3.7 million RLOC.  Defendants Plowman and Summers attended by telephone.

32.     As with the previous loans of $4 million to Horizon, the CAR supporting the loan specifically identified the loan structure as an RLOC and warned the Defendants that the loan's weaknesses included the fact that it provided 100 percent financing to a start-up business located out of state in Tennessee, that it would be secured by mobile assets, and that guarantees supporting the loan were limited to 20 percent of the debt.

33.     In addition to the risks identified in the CAR, the Defendants knew or should have known that other risks attendant to making this loan included, *inter alia*, that the loan terms did not require an equity contribution from the borrower; that the borrower's financial information reflected an inadequate cash flow; that the debt service coverage ratios were insufficient; that the collateral would quickly depreciate; that the loan lacked requisite collateral controls; that the credit request improperly relied on prospective operating statements; and that approving the loan would create a concentration of credit with existing principals of the borrower.

34.     As with the earlier Horizon loans, Defendants also knew or should have known that structuring the loan as an RLOC was improper because it allowed the borrower to make excessive

draws beyond the original draws for purchase of semi- tractors. The loan should have been structured as a purchase money facility to acquire a defined number of used semi-tractor units for lease to drivers.

35.     Because the RLOC structure allowed the borrower to make draws for note payments and other purposes, the principal balance on the loans never substantially declined, as would have occurred had the Defendants used a loan structure with a defined payout commensurate with the nature of the collateral and its rapid depreciation.

Likewise, securing the loan with rapidly depreciating and mobile commercial vehicles resulted in collateral that declined in value by over 50 percent in approximately two years.

36.     Prior to considering whether to approve the $1.5 million Horizon loan, the Defendants, as members of the Board of Directors, knew or should have known that the Bank had been previously criticized by examiners for weak loan administration, out-of-area lending, for making loans with high LTV ratios, and for having high concentrations of credit within the lending portfolio.

37.     The Defendants approved the $1.5 million loan to Horizon on or about September 30, 2005, without informing themselves of the relevant risks attendant to this loan.

38.     Horizon Leasing, LLC defaulted on this loan and the Bank charged-off $1.1 million on or about October 29, 2008.  Corn Belt ultimately charged off a total of approximately $4.43 million on all of the loans extended to Horizon Leasing, LLC.

### The $5 Million Brentwood Loan

39.     Defendants Stark, Adkins and Summers attended a Loan Committee meeting on or about February 3, 2006, and were presented with a loan request to make a $5 million loan to Brentwood who sought to purchase 100 semi-tractors for leasing.

40.     As with the previous loans to Horizon, the CAR supporting the $5 million loan to Brentwood specifically identified the loan structure as an RLOC and warned these Defendants that the loan's weaknesses included the fact that it provided financing to a start up business located out of state in Tennessee, that it would be secured by mobile assets, and that guarantees supporting the loan were limited to the amount of the guarantors' ownership interest in Brentwood.

41.     In addition to the risks identified in the CAR, these Defendants knew or should have known that other risks attendant to making this loan included, *inter alia*, that the loan terms did not require an equity contribution from the borrower; that the loan terms provided for 100 percent financing; that borrower's financial information reflected an inadequate cash flow; that the debt service coverage ratios were risky; that there were insufficient collateral controls; that the credit request improperly relied on prospective operating statements; and that approving the loan created a concentration of credit with the principals of the borrower.

42.     These Defendants also knew or should have known that structuring the loan as an RLOC was improper because it allowed the borrower to make excessive draws beyond the original draws for purchase of semi-tractors. The loan should have been structured as a purchase money facility to acquire a defined number of used semi-tractor units for lease to drivers.

43.     These Defendants should have used a loan structure with a defined payout commensurate with the nature of the collateral and its rapid depreciation.  Likewise, securing the loan with rapidly depreciating and mobile commercial vehicles resulted in collateral that declined in value by over 50 percent in approximately two years.

44.     On or about January 20, 2006, just prior to considering whether to approve the $5 million Brentwood loan, these Defendants knew or should have known that the Bank had been

criticized by examiners a third time for having weak loan administration, for making high LTV loans, and for having high concentrations of credit within the lending portfolio.

45.     The Defendants Stark, Adkins and Summers approved the $5 million loan to Brentwood on or about February 3, 2006, without adequately informing themselves of the relevant risks attendant to this loan.

46.     Brentwood Leasing, LLC, defaulted on the loan and the Bank charged-off approximately $2.66 million on this loan on or about October 29, 2008, and $1.75 million on or about December 9, 2008.  In total, the Bank charged off approximately $4.41 million on the loan to Brentwood Leasing, LLC.

### The $1.8 Million McKenzie Loan

47.     The Defendants attended a Loan Committee meeting on or about April 6, 2007, and were presented with a loan request to make a $1.8 million loan to McKenzie.  The purpose of the McKenzie loan was to facilitate the payment of a premium to the owners of Horizon and Brentwood in order for McKenzie to assume the $10 million in their existing RLOC debt, their operating assets, and membership interests.

48.     The CAR supporting the loan specifically identified that the loan was to a new borrower for an out-of-area loan; that Brentwood had weak cash flow; and that it would create a concentration of credit for the principal of McKenzie.

49.     In addition to the risks identified in the CAR, the Defendants knew or should have known that other risks attendant to making this loan included, *inter alia*, that the loan terms did not require an equity contribution from the borrower; that the loan terms provided for 100 percent financing; that borrower's financial information reflected an inadequate cash flow; that the debt

service coverage ratios were risky; that there was insufficient collateral; and that making the loan would result in a legal lending limit violation.

50.     A draft audit report prepared by McKenzie's CPA and provided to the Bank in support of the loan revealed that McKenzie had a highly leveraged balance sheet, negative working capital, weak cash position, and assets centered in semi-tractors. The statement of cash flows reported negative cash flow due to significant payments on capital lease obligations.

51.     Defendant Plowman made a motion to table these loans, Defendant Summers seconded the motion, and the McKenzie loan was not approved.

52.     Neither Stark nor Adkins had authority to unilaterally approve the McKenzie loan because funding it would result in McKenzie becoming indebted to the Bank in an amount exceeding $12 million.

53.     On or about May 3, 2007, Stark directed Adkins to proceed closing the Horizon, despite the fact that the Loan Committee tabled the loan request.  The Bank booked the McKenzie loan on or about June 29, 2007 for $1.8 million.

54.     On or about July 20, 2007, the Defendants sitting as the Loan Committee received a new loan report that reflected that the McKenzie loan had been made.  The minutes to that meeting do not reflect that any of the Defendants questioned or objected to the extension of credit to McKenzie after the loan request had been tabled.

55.     The Defendants appeared at a Loan Committee meeting on or about December 7, 2007, and received the delinquent loan report.  Defendant Adkins informed the Defendants that the principals of Horizon would be meeting the following week regarding their plan to raise capital to bring the loans current.

56.     Defendants Stark, Adkins and Summers attended another Loan

Committee meeting on or about the morning of December 21, 2007, and received another delinquent loan report.  As part of that report, Adkins informed Stark and Summers that he was anticipating payment on the Brentwood and Horizon loans the following week.  Defendant Plowman was absent from this meeting.

57.     Later in the morning of December 21, 2007, Defendants Stark, Adkins, and Summers attended the regular meeting of the Board of Directors in closed session and discussed the exit meeting with FDIC and State bank examiners.  Stark then reviewed the Bank's progress regarding the memorandum of understanding that it entered into with its examiners.  Topics of discussion at this meeting included substandard assets, classified loans, loan concentrations, potential lending limit violations on unrelated loans, and a high LTV loan report.  Defendant Plowman was not present at this meeting.

58.     Defendant Adkins then discussed cash flow issues regarding the McKenzie loan, and requested that the Board formally approve the loan submitted in April.  Adkins reported that the loan approval of the McKenzie was not ratified by the Board, that an internal audit in August of 2007 listed this as a "minor exception" and that it was necessary for the Board to ratify the approval by formally approving the April 3, 2007 CAR and changes to it.  Defendant Summers made a motion to approve the loan and it was seconded.

59.     The minutes of this meeting reveal that none of the Defendants questioned the circumstances surrounding the funding of the McKenzie loan.

60.     The failure of Stark and Adkins to formally re-submit this loan to the Loan Committee for re-consideration, and their failure to resolve the numerous risks attendant to the McKenzie loan before funding it demonstrates their knowing indifference to act with appropriate care in connection with the underwriting and funding of this loan.

61.     McKenzie Trucking and Leasing, LLC, defaulted on the loan and the Bank charged-off approximately $1.64 million on this loan on or about October 29, 2008.

### NEGLIGENT LOAN ADMINISTRATION
### AND THE FAILURE TO PROTECT SECURITY INTERESTS

62.     Defendants Stark and Adkins were responsible for overseeing that the Bank obtained and controlled security interests in the collateral securing the Loss Loans and that these loans were administered in a safe and sound manner.  Defendants Stark and Adkins had a duty to ensure that the Bank was monitoring the collateral securing the Loss Loans and that the borrowers were complying with all loan terms and conditions.

63.     Defendants Stark and Adkins breached these duties by *inter alia*, failing to ensure that the borrower had sufficient maintenance reserves deposited with the Bank as required by the loan terms, and by failing to ensure that the Bank monitored and controlled the titles to semi-tractors that served as collateral for the Loss Loans.

### The Horizon Loans

64.     The three Horizon loans were originated on or about June 22, 2005, and October 7, 2005.  On or about September 30, 2008, examiners found that the Bank was missing titles to 44 semi-tractors that were supposed to be serving as collateral securing this loan.

65.     Without titles to these semi-tractors, the Horizon loans were unsecured in an amount equal to the money lent by the Bank to Horizon to purchase the semi tractors.

66.     When Horizon defaulted on the notes, the Bank was unable to exercise its security interests in the semi-tractors that it did not have title to.  This caused the Bank to incur losses.

67.     The terms of the Horizon loan required that Horizon maintain $550,000 in reserve maintenance accounts.  Bank examiners noted that on or about September 29, 2008, the Horizon maintained only $1,194 in total deposits with the Bank.

68.     When Horizon defaulted on its note, the Bank was unable to exercise its right to set-off against the amounts that should have been in Horizon's maintenance reserve accounts.  This caused the Bank to incur losses.

### The Brentwood Loan

69.     The Brentwood loan was originated on or about February 17, 2006.  On or about September 29, 2008, examiners found that the Bank was missing titles to 33 semi-tractors that were securing this loan.

70.     Without titles to these semi-tractors, the Brentwood loan was unsecured in an amount equal to the money lent by the Bank to Brentwood to purchase those semi-tractors.

71.     When Brentwood defaulted on its note, the Bank was unable to exercise its security interests in the semi-tractors that it did not have title to.  This caused the Bank to incur losses.

72.     The terms of the Brentwood loan required that it maintain $340,000 in maintenance reserve accounts.  Bank examiners noted that on or about September 29, 2008, the Brentwood maintained only $532 in total deposits with the Bank.

73.     When Brentwood defaulted on its note, the Bank was unable to exercise its right to set-off against the amounts that should have been in Brentwood's maintenance reserve accounts. This caused the Bank to incur losses.

74.     Corn Belt suffered losses of $10.4 million on the five Loss Loans, a 98 percent loss.  Had Stark and Adkins acted properly in administering the loans and protecting the Bank's security interest in its collateral, Corn Belt's losses could have been significantly mitigated.

**COUNT I**
**GROSS NEGLIGENCE CLAIMS AGAINST**
**STARK, ADKINS, SUMMERS AND PLOWMAN**
**UNDER 12 U.S.C. §1821(k)**
**FOR APPROVING ONE OR MORE OF THE LOSS LOANS**

75.     FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1-74 above as if fully set out in this count.

76.     The Defendants were members of the Loan Committee, and were officers and/or directors of Corn Belt during the relevant times.

77.     Section 1821(k) of FIRREA holds directors or officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.  Illinois law defines "gross negligence" as "very great negligence," but something less than willful, wanton and reckless conduct.

78.     As directors and/or officers, the Loan Committee Defendants owed Corn Belt a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to, the following:

    a.    informing themselves about proposed loans and the risks the loans pose to the Bank before they approve them;

    b.    approving only those loans that conformed with the Bank's Loan Policies;

    c.    ensuring that any loans they approved were underwritten in a safe and sound manner;

    d.    ensuring that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

    e.    ensuring that any loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

79.     The Loan Committee Defendants breached their duties and were grossly negligent by, *inter alia*:

    a.    failing to inform themselves about the risks that the Loss Loans posed to the Bank before they approved them;

    b.    approving the Loss Loans with terms that were inconsistent with the Bank's Loan Policy;

16

    c.      failing to ensure that the Loss Loans were underwritten in a safe and sound manner;

    d.      failing to ensure that the Loss Loans were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

    e.      failing to ensure that the Loss Loans did not violate applicable banking regulations and/or created unsafe and unsound concentrations of credit.

80.    As a direct and proximate result of the Loan Committee Defendants' gross negligence, FDIC suffered damages in the amount of $10.4 million.

## COUNT II
## NEGLIGENCE CLAIMS AGAINST
## STARK, ADKINS, SUMMERS AND PLOWMAN
## UNDER ILLINOIS LAW
## FOR APPROVING ONE OR MORE THE LOSS LOANS

81.    FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1-74 above as if fully set out in this count.

82.    The Defendants were members of the Loan Committee, and were officers and/or directors of Corn Belt during the relevant times.

83.    Sitting as the Loan Committee, the Defendants owed Corn Belt a duty under Illinois law to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to, the following:

    a.      informing themselves about proposed loans and the risks the loans pose to the Bank before they approve them;

    b.      approving only those loans that conformed with the Bank's Loan Policies;

    c.      ensuring that any loans they approved were underwritten in a safe and sound manner;

    d.      ensuring that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

    e.      ensuring that any loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

84.     The Loan Committee Defendants breached their duties and were negligent by, *inter alia*:

  a.     failing to inform themselves about the risks that the Loss Loans posed to the Bank before they approved them;

  b.     approving the Loss Loans with terms that were inconsistent with the Bank's Loan Policy;

  c.     failing to ensure that the Loss Loans were underwritten in a safe and sound manner;

  d.     failing to ensure that the Loss Loans were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

  e.     failing to ensure that the Loss Loans did not violate applicable banking regulations or create unsafe and unsound concentrations of credit.

85.     As a direct and proximate result of the Loan Committee Defendants' negligence, FDIC suffered damages in the amount of $10.4 million.

**COUNT III**
**GROSS NEGLIGENCE CLAIMS AGAINST STARK AND ADKINS**
**UNDER 12 U.S.C. §1821(k)**
**FOR MAKING THE MCKENZIE LOAN**

86.     FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1-74 above as if fully set out in this count.

87.     Stark was an officer and a director of Corn Belt during the relevant times. Adkins was an officer of Corn Belt during all relevant times.

88.     As a director and/or officers, Stark and Adkins are subject to §1821(k) of FIRREA which holds them personally liable for loss or damage to the institution caused by "gross negligence" as defined by applicable state law.  Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton and reckless conduct.

89.     Stark and Adkins owed the Bank a duty to use reasonable care, skill and diligence in the performance of all their duties, including:

    a.    informing themselves about proposed loans and the risks they pose to the Bank before they approve and/or take action to fund loans;

    b.    approving and/or taking action to fund only those loans that conform with the Bank's Loan Policy;

    c.    ensuring that any loans they approved are underwritten in a safe and sound manner;

    d.    ensuring that any loans they approved and/or take action to fund are secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

    e.    ensuring that any loans they approved and/or take action to fund do not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

90.     Stark and Adkins were grossly negligent by, *inter alia*:

    a.    failing to inform themselves about the McKenzie loan and the risks it posed to the Bank before they approved and took action to fund the loan;

    b.    funding the McKenzie loan in violation of the Bank's Loan Policy;

    c.    failing to ensure that the McKenzie loan was underwritten in a safe and sound manner;

    d.    failing to ensure that the McKenzie loan was secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

    e.    failing to ensure that the McKenzie loan did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit before they took action to fund the loan.

91.     As a direct and proximate result of the gross negligence of Stark and Adkins, individually and jointly, the FDIC suffered damages in the amount of $1.64 million.

**COUNT IV**
**NEGLIGENCE CLAIMS AGAINST STARK AND ADKINS**
**UNDER ILLINOIS LAW**
**<u>FOR MAKING THE MCKENZIE LOANS</u>**

92.     FDIC re-alleges and incorporates by reference the allegations contained in paragraphs

1-74 above as if fully set out in this count.

93.     Stark was an officer and a director of Corn Belt during the relevant times.

Adkins was an officer of Corn Belt during all relevant times.

94.     Under Illinois law, Stark and Adkins owed the Bank a duty to use reasonable care,

skill and diligence in the performance of all their duties, including:

> a.     informing themselves about proposed loans and the risks they pose to the Bank before they approve and/or take action to fund loans;
>
> b.     approving and/or taking action to fund only those loans that conform with the Bank's Loan Policy;
>
> c.     ensuring that any loans they approved are underwritten in a safe and sound manner;
>
> d.     ensuring that any loans they approved and/or take action to fund are secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and
>
> e.     ensuring that any loans they approved and/or take action to fund do not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

95.     Stark and Adkins were negligent by, *inter alia*:

> a.     failing to inform themselves about the McKenzie loan and the risks it posed to the Bank before they approved and took action to fund the loan;
>
> b.     funding the McKenzie loan in violation of the Bank's Loan Policy;
>
> c.     failing to ensure that the McKenzie loan was underwritten in a safe and sound manner;
>
> d.     failing to ensure that the McKenzie loan was secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and
>
> e.     failing to ensure that the McKenzie loan did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit before they took action to fund the loan.

96.     As a direct and proximate result of the negligence of Stark and Adkins, individually and jointly, the FDIC suffered damages in the amount of $1.64 million.

**COUNT V**
**GROSS NEGLIGENCE CLAIMS AGAINST STARK AND ADKINS**
**UNDER 12 U.S.C. §1821(k)**
**FOR FAILING TO PROPERLY ADMINISTER THE LOSS LOANS AND FAILING TO PROTECT SECURITY INTERESTS IN COLLATERAL**

97.     FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1-74 above as if fully set out in this count.

98.     Stark was an officer and director of Corn Belt during the relevant times. Adkins was an officer of Corn Belt during all relevant times.

99.     Section 1821(k) of FIRREA holds directors or officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.  Illinois law defines "gross negligence" as "very great negligence," but something less than willful, wanton and reckless conduct.

100.     As a director and/or officers, Stark and Adkins owed Corn Belt a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to, ensuring that the loans were administered in a safe and sound manner, that borrowers complied with all loan terms and conditions and that the Bank obtained and controlled its security interests in collateral securing loans.

101.     Defendants Stark and Adkins breached these duties by *inter alia*, failing to take all necessary actions to ensure that borrowers of the Loss Loans had sufficient maintenance reserves deposited with the Bank as required by loan agreements, and by failing to take all necessary actions

to ensure that the Bank obtained and monitored its security interests in the collateral securing the Loss Loans.

102.     As a direct and proximate result of the gross negligence of Stark and Adkins, individually and jointly, the FDIC suffered damages in the amount to be determined at trial.

**COUNT VI**
**NEGLIGENCE CLAIMS AGAINST STARK AND ADKINS**
**UNDER ILLINOIS LAW**
**FOR FAILING TO PROPERLY ADMINISTER THE LOSS LOANS AND**
**FOR FAILING TO PROTECT SECURITY INTERESTS IN COLLATERAL**

103.     FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1-74 above as if fully set out in this count.

104.     Stark was an officer and director of Corn Belt during the relevant times. Adkins was an officer of Corn Belt during all relevant times.

105.     As a director and/or officers, Stark and Adkins owed Corn Belt a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to, ensuring that the loans were administered in a safe and sound manner, that borrowers complied with loan conditions and that the Bank obtained and controlled its security interests in collateral securing loans.

106.     Defendants Stark and Adkins breached these duties by *inter alia*, failing to take all necessary actions to ensure that borrowers of the Loss Loans had sufficient maintenance reserves deposited with the Bank as required by loan agreements, and by failing to take all necessary actions to ensure that the Bank obtained and monitored its security interests in the collateral securing the Loss Loans.

107.     As a direct and proximate result of the negligence of Stark and Adkins, individually and jointly, the FDIC suffered damages in the amount to be determined at trial.

Respectfully submitted,

**FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver of CORN
BELT BANK AND TRUST COMPANY**

Dated: March 1, 2011

/s/*David Fischer*
David J. Fischer (ARDC No.  6184102)
LEBOW MALECKI & TASCH, LLC
230 West Superior Street, Suite 500
Chicago, Illinois 60654
(312) 705-2000 - Telephone
(312) 705-2001 – Facsimile
djflaw@mac.com

Leonard J. DePasquale
Counsel
FEDERAL DEPOSIT INSURANCE CORPORATION
3501 North Fairfax Drive, VS-B-7058
Arlington, Virginia 22226
(703) 562-2063 – Telephone
ldepasquale@FDIC.gov

Stephen R. Kaufmann (ARDC No. 03126728)
**HeplerBroom LLC**
**400 South Ninth Street Suite 100**
**Springfield, IL 62701**
**Tel: 217-528-3674**
**Fax: 217-528-3964**
Stephen.Kaufmann@heplerbroom.com